IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DeLONG

                      :

                      :

                      :

       V.             :           C.A.NO. 05-3371

                      :

                      :

                      :

AETNA LIFE INSURANCE
COMPANY

                      :


<u>MEMORANDUM</u> <u>OPINION</u> <u>AND</u> <u>ORDER</u>


RUFE, J.                                  FEBRUARY 9, 2006

        Plaintiff brought this action under the Employee Retirement Insurance Security Act of 1974, 29 U.S.C. section 1001, et seq., as amended ("ERISA"), claiming Defendant wrongfully terminated his long-term disability benefits. Presently before the Court is the Defendant's motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.

        Under 56(c), summary judgment may be granted when,"after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists

and the moving party is entitled to judgment as a matter of law." [1]
For a dispute to be "genuine," the evidence must be such that a
reasonable jury could return a verdict for the nonmoving party. [2] If
the moving party establishes the absence of a genuine issue of
material fact, the burden shifts to the nonmoving party to "do more
than simply show that there is some metaphysical doubt as to the
material facts." [3]  The non-moving party may not rely merely upon
bare assertions, conclusory allegations, or suspicions. [4]

As the Court finds no genuine disputes as to any material
fact, the Court holds this case is suitable for summary disposition.

Plaintiff was employed at the University of Pennsylvania
("Penn") as a Financial Aid Officer  when he fell down a flight of
stairs while at work on October 4,1996. That was also the last day
Plaintiff worked.  Plaintiff applied for and began receiving long- term
disability benefits under Penn's employee benefit plan. When Plaintiff
began receiving disability benefits, Penn both funded the plan and
administered the benefits thereunder. Penn continued to serve both

1.   Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir.
1990).

2.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

3.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 586 (1986).

4.   Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d
Cir. 1982).

roles until May 1, 2003 when Penn entered into an agreement with Defendant whereby Defendant would assume the responsibility of administering the benefits which includes determining who qualifies for benefits under the plan, while Penn would only fund the plan. The terms and conditions of the plan remained the same.

The plan provides that in order to be eligible for long-term disability benefits, Plaintiff must have demonstrated an inability "to engage in any occupation appropriate to [Plaintiff] by reason of education, training and experience."[5] During the six years that Penn administered the plan, it routinely recertified Plaintiff's disability benefits for another year based solely on an annual update from Plaintiff's treating physician, Dan Jacobs, D.O. [6] Plaintiff received long-term disability benefits from April 3, 1997 through August 31, 2004.

When Defendant began administering claims under Penn's plan in 2003, it requested that Dr. Jacobs complete an Attending Physician Statement regarding Plaintiff's diagnosis, treatment, and restrictions and limitations. [7] Dr. Jacobs completed this form on March 8, 2004, noting that Plaintiff's primary diagnosis was degen-

---

5.   Exhibit B to Defendant's Reply Brief in Support of Motion for Summary Judgment.

6.   Id. at Exhibit D.

7.   Id. at Exhibit E.

erative disc disease, multiple herniations and bulging and spinal stenosis. Dr. Jacobs indicated that Plaintiff's secondary diagnosis was bilateral torn medial meniscus. He described Plaintiff's condition as chronic and indicated that Plaintiff would need continuing treatment. Dr Jacobs further indicated that Plaintiff was "unable to sit, stand or walk more than 15 min. Cannot climb, squat, bend or kneel due to instability in lumbar spine and both knees."  Dr. Jacobs opined that Plaintiff's limitations would be "permanent." [8]

In April 2004, Defendant sent several forms to Plaintiff to complete and return concerning his disability. Plaintiff completed only one of these forms, the Claimant Supplemental Statement, which requested information on how Plaintiff's physical condition prevents him from working. Plaintiff stated, inter alia, that: "I am in pretty constant pain. I can not sit or stand for any length of time, without contracting more severe pain..."  [9] Plaintiff also stated that he did not know when he would be able to return to part-time work and that he did not expect to return to full-time work.

Defendant hired an outside corporation, Commercial Index Bureau, Inc., to conduct surveillance on Plaintiff, which it did on

---

8.   Id.

9.   Id. at Exhibit H.

4

June 15, 2004, June 16, 2004, June 25, 2004 and June 26, 2004.[10]
No results were obtained on June 15th and June 16th. On June 25th,
Plaintiff was followed as he drove from Philadelphia to a property to
which he is associated in Wildwood, New Jersey. The drive lasted
approximately 90 minutes.

The results of the video on June 25th showed that Plaintiff
"move[d] about freely, showing no outward signs of disability,
walking to and from his vehicle, bending inside and then walking
back up the steps and returning inside." The surveillance log for
June 26th showed Plaintiff sitting on his porch, moving his hands
and arms in frequent gestures. "He did not appear to be wearing any
corrective orthopedic devices, and did not have any walking aids
near-by."

The video from June 26th showed Plaintiff standing on his
porch talking to two individuals. According to the log, "[Plaintiff]
occasionally bent slightly at the waist as he gestured with his hands
to emphasize his speaking. He lifted his left leg and placed his foot on
the arm of the chair in which he had been sitting, leaving his left leg
bent at a 90-degree angle as he stood. He also placed his left arm on
his knee in a resting position. He then lowered his leg and continued
to gesture with his hands, before returning to his seat." The video

---

10.  Id. at Exhibit I.

next showed Plaintiff "walk[ing] in a normal fashion to his vehicle. He did not appear to have any difficulty in walking... He walked back toward the residence, stepping up onto the curb with his right foot, and not appearing to have any difficulty in doing so..."

The video next observed Plaintiff "in a standing position while appearing to swing his hips from front to back briefly as he stood with no support." He then walked to the back of his residence. Plaintiff was next observed on the second level of a separate building. According to the log, "[Plaintiff] climbed a set of wooden stairs to the third level... He appeared to move in an easy and uninhibited manner, and did not use the railing for a large part of his ascent up the stairway." Plaintiff was later seen descending the long set of stairs without using the railing. "He threw his arms out to the side of his body and did not have any difficulty navigating the stairway to the second level. He then closed the door to a second level residence, by leaning to his right, lifting his left leg and placing all of his weight on his right leg as he also pulled the door closed. He descended the stairs from the second to the first level of the residence, placing his left hand on the railing as he came down and slid it along the railing."

On July 12, 2004, Defendant requested that an investigator from another independent corporation, MJM Investigations, Inc.,

interview the Plaintiff. The interview took place at Plaintiff's residence in Philadelphia on July 12, 2004.[11] At this interview, the investigator observed the following:

> The Investigator...observed the Claimant through the screen door, rising, one cane in each hand, in what appeared to be a difficult, off-balance, strenuous manner, from a recliner chair located near the front door....The Claimant sat back down in his recliner and laid the one cane beside him leaning on the chair...He wore...a brace on his left knee.[Plaintiff stated that] he suffers from severe back problems including several herniated disks in his lower back. spinal stenosis, and degenerative disk diseases. He expressed bilateral pain and discomfort in his hips and knees from arthritis. The pain is more severe in his right hip and left knee. At times, his knees will `give out.'He has constant pain in his knees and a burning, aching feeling in his hips...[Plaintiff] stated that he utilizes one cane when he is at home but will use two when he leaves his residence for added support...The claimant described his limitations as `not being able to do anything for very long.' He is able to walk, stand , ascend and descend steps, and occasionally bend at the waist but in moderation. He experiences increased pain when he attempts to bend at the waist or knees In a standing position he stated he could not lift anything over 10 pounds but in a sitting position could lift more , possibly over 20 pounds if just using his arms. He can't be on his feet too long and could walk for maybe 10-15 minutes at a time and maybe take an occasional walk around the block. [H]e stated that he needs assistance while traveling and sometimes fears traveling alone but the Investigator observed the claimant departing the residence

---

11.  Exhibit O to Plaintiff's Response to Defendant's Motion for Summary Judgment.

and operating a vehicle by himself upon an unannounced visit to the residence several weeks ago. The Claimant also stated that he only uses one cane when he is at home but will take both with him when he leaves the residence. However, the Claimant was observed using both canes when the Investigator re-visited the residence to conduct the interview.

On August 2, 2004, Defendant sent Plaintiff a letter stating that Plaintiff's long-term benefits would be terminated as of August 31, 2004 because Plaintiff no longer met the definition of disability under the plan.[12] Plaintiff appealed the decision through counsel and on January 14, 2005, submitted additional medical documents to Defendant to consider on appeal.[13] Defendant informed Plaintiff that it had referred Plaintiff's file to an independent medical examiner for a review of Plaintiff's residual functional capacity and that counsel would receive a response by May 7, 2005.[14] By letter dated March 2, 2005, Plaintiff's counsel submitted more recent medical records from other physicians. [15]

---

12.   Id. at Exhibit P.

13.   Exhibit J to Defendants Reply Brief.

14.   Id.

15.   Id. at Exhibit k.

On March 3, 2005, the independent medical examiner, Defendant Carl Huff, MD, MPH, FACPM, CIME, submitted his report and opinion to Defendant.[16] Dr. Huff concluded that

> "there is no indication that the claimant has sustained any neurologic consequence that would make him functionally disabled to work. There are many persons with degenerative disc diseases of the spine who work every day, and in the absence of neural impingement it would certainly be feasible for this man to return to a light level of work, which constitutes occasional lifting limit of 20 pounds and frequent lifting limit of 10 pounds with no restrictions on standing, walking or sitting. Also, his ability to ascend and descend stairs has already been proven. As far as his knees are concerned, he does have age related degenerative changes, but this does not interfere with his ability to walk as clearly demonstrated on the surveillance video."

On March 4, 2005, Defendant sent Plaintiff's counsel a letter stating that Defendant had upheld its decision to terminate Plaintiff's long-term disability benefits. [17]

Under ERISA, the applicable standard of review for a denial of benefits pursuant to 29 U.S.C. section 1132 depends on the actual language in the plan. When a plan grants an administrator discretionary

---

16.   Exhibit Q to Plaintiff's Response to Defendant's Motion for Summary Judgment.

17.   Id. at Exhibit R.

authority, an administrator's factual finding and plan interpretation are reviewed under an arbitrary and capricious standard.[18]

In the case <u>sub judice</u>, the parties agree that the plan vests discretionary authority in Defendant to decide claims. Accordingly, the Court must, as a matter of law, review the administrator's decision to deny Plaintiff benefits under the deferential arbitrary and capricious standard.[19] An administrator's decision is arbitrary and capricious where it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law."[20] When considering whether an administrator's decision was arbitrary and capricious, the Court may only consider the evidence which was before the plan administrator at the time of the final decision.[21] Provided that the plan administrator's decision is rational, the Court is not free to substitute its own judgment for that of the plan administrator's in determining the eligibility for plan

18. <u>Mitchell</u> <u>v.</u> <u>Eastman</u> <u>Kodak</u> <u>Co.</u>, 113 F.3d 433, 438-39 (3d Cir. 1997)

19. Since Aetna does not have the dual role as both the entity that determines who qualifies for benefits and the entity that pays for those benefits, Judge Becker's analysis in <u>Pinto</u> <u>v.</u> <u>Reliance</u> <u>Standard</u> <u>Life</u> <u>Ins.</u> <u>Co.</u> 214 F.3d 377, 387 (3d Cir. 2000) is inapplicable.

20. <u>Abnathya</u> <u>v.</u> <u>Hoffmann-La</u> <u>Roche,</u> <u>Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993)(internal quotations omitted).

21. <u>Mitchell</u>, 113 F.3d at 440 (3d Cir. 1997)

benefits even if the Court disagrees with the decision of the plan administrator.[22]

In the case sub judice, the plan administrator was faced with conflicting evidence concerning Plaintiff's disability. We find that Defendant's decision to terminate Plaintiff's benefits was based on Defendant's determination, supported by an independent medical evaluation (Dr. Huff) and objective observation (the surveillance video), that Plaintiff was no longer medically eligible for long-term disability benefits. Specifically, Dr. Huff opined, after reviewing Plaintiff's entire medical history, that "there is no indication that the claimant has sustained any neurologic consequence that would make him function-ally disabled to work." The surveillance video indicated that Plaintiff's physical limitations in no way matched Plaintiff's description of his limitations or the opinion of Plaintiff's treating physician, Dr. Jacobs . In view of the above, the Court cannot find that the Defendant's decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law. Thus, Defendant's decision to discontinue Plaintiff's benefits was neither arbitrary nor capricious.

Plaintiff contends that the administrator did not give proper deference to the opinion of Plaintiff's treating physician that Plaintiff was "totally disabled." Plaintiff's argument would carry some merit if

---

22.   Mitchell, 113 F.3d at 439; Abnathya, 2 F.3d at 45.

the case sub judice involved a claim for Social Security disability benefits. However, the United States Supreme Court has held that ERISA administrators are not required to defer to doctors who have treated a claimant over those doctors who have merely reviewed a claimant's medical files. [23]

Finally, Plaintiff seeks to introduce an additional medical report from Dr. Jacobs dated April 22, 2005 in an attempt to refute Defendant's decision to terminate his benefits. As noted above, however, our review is strictly limited to the record before the plan administrator at the time he rendered his decision. The Third Circuit has noted only two limited situations in which it may be appropriate to consider evidence outside the administrative record: (1) when outside evidence is needed to aid the Court in its understanding of the medical issue involved or (2) when outside evidence is needed to demonstrate potential biases and conflicts of interest that are not found in the administrator's record. [24] Neither of those exceptions applies to Dr. Jacob's report, which simply reasserts Dr. Jacob's opinion that Plaintiff is totally disabled.

---

23.   Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003).

24.   Kosiba v. Merck & Co., 384 F.3d 58, 69 (3d Cir. 2004).

For all the foregoing reasons, summary judgment is entered in favor of the Defendant and against the Plaintiff.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DeLONG

                                    :
                                    :
                                    :
       V.                             :        C.A.NO. 05-3371
                                    :
                                    :
                                    :

AETNA LIFE INSURANCE
COMPANY

ORDER

AND NOW this 9th day of February, 2006, upon

consideration of the motion of the Defendant for summary judgment

[Doc. #8] and all responses thereto, it is hereby ORDERED that:

Defendant's motion for summary judgment [Doc.

# 8 ] is GRANTED.

Judgment is ENTERED in favor of the Defendant and

against the Plaintiff.

The Clerk of Court is DIRECTED to mark this case closed for

statistical purposes.

IT IS SO ORDERED.

                       _/s/ CYNTHIA M. RUFE_____
                           CYNTHIA M. RUFE, J.